250 F.2d 558
 The CENTRAL RAILROAD COMPANY OF NEW JERSEY, in its own behalf as owner of THE barge CRR NO. 347 and bailee of the cargo laden thereon and as bailee of her captain's effects, Plaintiff-Appellant,
v.
NEW YORK DOCK COMPANY, Defendant, and
Universal Terminal & Stevedoring Co., Inc., Defendant-Appellee.
 No. 49.
 Docket 24625.
 United States Court of Appeals Second Circuit.
 Argued November 8, 1957.
 Decided December 13, 1957.
 
 Vincent E. McGowan, New York City, for plaintiff-appellant.
 Hagen & Eidenbach, New York City (Charles W. Hagen and Kenneth E. Foley, New York City, of counsel), for defendant-appellee.
 Before SWAN, MEDINA and WATERMAN, Circuit Judges.
 MEDINA, Circuit Judge.
 
 
 1
 On September 29, 1952 there was a five-alarm fire at Pier 9, Brooklyn, N. Y., in the course of which barge CRR No. 347, owned by plaintiff, Central Railroad Company of New Jersey, and certain cargo and the captain's effects were burned and damaged. Pier 9 was owned by defendant New York Dock Company and leased to and operated by defendant Universal Terminal & Stevedoring Co., Inc. The complaint charged a negligent causing of the fire by both defendants, but at the close of the evidence the cause of the fire was as much a mystery as when the trial began, and this basis of recovery was removed from the case by dismissal. In the course of the trial the court also ruled that "the issue of failing to find and extinguish is not in the case and I so rule." There was submitted to the jury, as sufficiently within the scope of the complaint under the Federal Rules of Civil Procedure, rule 7, 28 U.S.C.A., the single question of whether either or both defendants were chargeable with negligence "in failing to contain and extinguish the fire after it started so as to prevent damage to plaintiff's barge and contents." In other words, a verdict in plaintiff's favor in the stipulated amount of damages, $27,159.22, could be rendered only after a finding of negligence and a further finding that such negligence was the proximate cause of the damage to the barge and contents. The jury found in favor of defendant New York Dock Company and against defendant Universal Terminal & Stevedoring Co., Inc. A motion to set aside the verdict and dismiss the complaint was made by Universal and this motion was granted with the comment, "The evidence of negligence possibly may meet the requirement of substantiality but with respect of proximate cause the evidence is clearly insufficient." On this appeal by plaintiff no attack is made upon so much of the final judgment as exonerates New York Dock Company, nor upon any of the rulings made at the trial. The single, narrow issue presented is whether or not the jury's verdict should be reinstated.
 
 
 2
 Pier 9 in Brooklyn was adjacent to extensive properties of the New York Dock Company along which, running North and South, was a two-track railway situated about forty feet from the bulkhead of the pier. The north side of the pier extended out over the water in a westerly direction 621 feet 1 inch; the length of the south side was 587 feet 8 inches; the overall width was 81 feet 6 inches; and the shed, of wooden construction with an overlay of corrugated steel, was 606 feet 3 inches in length and 78 feet 6 inches in width. The barge was moored in the customary fashion about midway down the pier.
 
 
 3
 There was what is described in the evidence as a stringpiece, two or three feet wide, running the full length of the pier on either side. This provided walking space for those working on the pier and access to the vessels moored alongside. One of the witnesses testified that the pier itself was "built on wooden piles, right across the pier, and the piles are in rows about 10 feet on center, and then on top of the wood piles there is a cap, 12 by 12 cross cap, and between these cross caps you have other timbers that span across there and we call them stringers. On top of the stringers you put the decking, spaced on top of the stringers; you put the 4-inch decking plank and on top of the decking plank you have the wearing surface which is all wood." There is testimony that one of the 12 by 12 crosspieces was rotten, as though chewed by rats, for a space of about four feet, that notice of this was given to Universal before the fire, and that the fire was first observed in this place.
 
 
 4
 As the pier was constructed in about 1880, and all the flooring and understructure was of wood, and as there is always a certain amount of oily deposit on the piles, with the rise and fall of the tide in New York harbor, it was obvious to the Fire Department, in the course of its repeated inspections, that a substructure fire could not be put out from above without some special provision for access to the fire through the floor of the pier. Accordingly, upon order of the Fire Department and for the exclusive use of the Fire Department, in the early part of 1952, many months before the fire, trenches were constructed at intervals in the floor of the pier so that revolving nozzles could be operated underneath the pier. The reason these trenches could not be used on this occasion was that the fire spread so rapidly, enveloping the entire entrance to the pier at the shore end within less than a minute after the arrival of the first brigade, that it was impossible to get into or on the pier to use the trenches.
 
 
 5
 The approach to the shore end of the pier is concrete, right up to the bulkhead, and on this concrete, just outside the pier were a number of drums described as "Red Label" cargo. But they were all safely removed by the firemen and did not contribute in any way to the spread of the fire. There was a certain amount of miscellaneous cargo in the shed but none of this was "Red Label" or such as to constitute any particular fire risk.
 
 
 6
 The entire inside of the shed was open to facilitate the loading and unloading of cargo; but in the southeast corner, near the bulkhead, were three small offices, used by members of Universal's staff in the course of their operations of loading and unloading ships and checking the cargo delivered to barges or lighters. Smoking was permitted in these offices, although not elsewhere on the pier; and, so far as we can make out from the transcript and the exhibits, the terms and conditions of the permit issued by the Fire Department of the City of New York were complied with.
 
 
 7
 While there was no automatic sprinkler system inside the shed, or elsewhere on the pier, there were three chemical fire engines, but each of them weighed some 450 or 500 pounds and there is some evidence that one man alone could not operate one of these. There was also a large number of barrels of water with galvanized iron pails hanging on them, located at intervals the whole length of the stringpiece on either side; and also a number of standpipes, using New York City water, each with 100 feet of hose and a nozzle. One of these standpipes was only a few feet distant from the office space.
 
 
 8
 At about 5 P.M. the various workmen and members of the staff of Universal left the pier. The only person remaining was a sort of combination gateman-watchman. He was an employee of McRoberts Protective Agency, under contract with Universal, and, after the workmen left in the late afternoon, it was his duty to clean out the offices and make hourly rounds to operate the American District Telegraph boxes at various places on the pier. These boxes served a dual purpose. Generally, in making his rounds the gateman-watchman merely put his key in each box in turn and gave it a twist, to show that he was on the job. In case of fire, however, the same box was equipped with a fire alarm which was operated by breaking the glass and pulling a lever.
 
 
 9
 The gateman-watchman had been working on this particular pier for many years and he had been trained in the use of fire-fighting apparatus by the Coast Guard during the late war, but had been given no further instructions by Universal or by his employer.
 
 
 10
 On the night of the fire he swept out the offices and made his regular rounds at 6 o'clock and again at about a quarter before 7 o'clock, noticing nothing wrong. At some time shortly before 7:30 the gateman-watchman was near the southerly or shore end of the pier when Keers, the watchman of the New York Dock Company, told him there was a fire on the pier and that he had already turned in an alarm to the Fire Department. What happened in the next few minutes clearly demonstrates, in our opinion, that nothing any one man or any number of men could have done would have stemmed the progress of the fire, and that alone is sufficient to sustain the trial judge's ruling that "with respect of proximate cause the evidence is clearly insufficient." The first alarm was pulled at 7:27 P.M.; at 7:29 P.M. the first battalion of the Fire Department arrived and within less than a minute thereafter the whole southerly end of the shed was ablaze and the fire broke out again 250 or 300 feet down the pier. What seemed to those who first observed it as "a little fire" that could be extinguished by a pail of water or a small quart and a half hand extinguisher filled with tetrachloride, must have been smouldering underneath the pier and running along the wooden understructure for some time before it was discovered. It is still a complete mystery as to how it started and there is no evidence in the case to indicate that it could have been discovered sooner with even the utmost vigilance. We turn to a brief description of what occurred in the critical period of a few minutes between the discovery of the fire and the sudden bursting into flames of the pier at the shore end and at a point some 250 or 300 feet offshore.
 
 
 11
 Keers sent in the first alarm at 7:27 P.M. and immediately thereafter told Cannon, the gateman-watchman, who was then "standing right at the gate" at the shore end, that there was a fire on the pier. Cannon walked into the three small offices, located at the southeast corner of the pier only a few steps away, saw no evidence of fire there and pulled the fire alarm at the nearby ADT box. Just then a New York Dock Company train, consisting of a locomotive and crew of five, including the engineer and the conductor, came along and one of the crew saw the fire. The engineer ran over with a small hand fire extinguisher, squirted it on the fire and then started to move his train away so the equipment of the Fire Department could get in close to the pier. When Cannon saw the engineer using his hand fire extinguisher that was the first time Cannon knew where the fire was and he testified it was "way down underneath" below the stringpiece, in the vicinity of the three small offices, and at the very place where he had observed the rotten 12 by 12. The fire seemed so small that Cannon first threw a pail of water on it. Then he tried to put in operation the hose located in the vicinity of the offices but could not get it through one of the windows, as in the excitement of the moment he apparently did not notice that the wire meshed screen outside the window was latched inside and could easily have been unlatched and swung outward. At this point, which Cannon estimates was "maybe two minutes" after Keers told him there was a fire on the pier, the pier itself was ablaze and Cannon "couldn't even get back to the pier to save my own clothes."
 
 
 12
 Viewed from another angle, Lieutenant Mitchell of the New York City Fire Department was the first to arrive at the scene, and he testified that this was between two and three minutes of the first alarm at 7:27 P.M. He saw a fire at the southeast corner of the pier near the office space. Suddenly, within thirty seconds of his arrival "the entire front of that pier was a flame." The various firemen also corroborated Cannon's statement that the fire also broke out about 250 or 300 feet down the pier.
 
 
 13
 Against this background of a seemingly small fire suddenly bursting into flames at various parts of the pier there is no significance to Cannon's testimony that the firemen and their equipment did not arrive for 15 or 20 minutes and the fireboats after an interval of 10 minutes. Doubtless it seemed a long time as Cannon waited for the arrival of the firemen; but what he described as happening in the two minutes after Keers told him there was a fire tallies precisely with the testimony of the firemen.
 
 
 14
 Was there sufficient proof of negligence against Terminal to take the case to the jury? We agree with Judge Boldt that this is a close question, but we also agree with his conclusion that the evidence lacks sufficient substance to warrant a finding of negligence. There is no proof that Universal was under any duty to install and maintain an automatic sprinkler system; nor is there any proof that it is customary to provide more than one watchman at night on a pier such as Pier 9. We may well assume that more than one man was required properly to operate either the chemical fire extinguisher or the hose and standpipe, but the fire alarm system was available and was used, and the five men of the crew of the New York Dock Company train were present as was Keers, the New York Dock Company watchman.
 
 
 15
 But the lack of proof of causation is clear. The real difficulty was that, at the time it was first discovered, the fire was of such a character that, even if there had been available unlimited manpower to operate the standpipe and hose and the chemical extinguishers and the pails of water from the drums, the effect on the imminent spread of the fire would have been nil. Moreover, even if we were to assume that for some reason Universal should have supplied an automatic sprinkler system, such was the character of this particular fire, which suddenly enveloped the whole face of the pier in flames and at the same time burst forth at a point 250 to 300 feet down the pier, that a sprinkler system would almost certainly have been of no avail. The plain truth of the matter is that a substructure pier fire can only be fought successfully by using the fire trenches which had been installed for that purpose; and it so happened that the flames which enveloped the shore end of the pier made it impossible for the firemen to reach the trenches and use them. None of this, so far as we can see, was due to any fault on the part of Universal or its employees.
 
 
 16
 Affirmed.